## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| EDDIE DUKES,<br><br>        Petitioner,<br><br>vs.<br><br>WARDEN JAY FORSHEY,<br><br>        Respondent. | CASE NO. 5:24-cv-01620<br><br>JUDGE CHARLES ESQUE FLEMING<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Petitioner Eddie Dukes ("Petitioner" or "Mr. Dukes") brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, asserting three grounds for relief relating to his sentence and convictions in Summit County Court of Common Pleas, Case No. CR-2021-09-3482, for rape with repeat violent offender specifications and gross sexual imposition.  (ECF Doc. 4 ("Petition"); ECF Doc. 9-1, pp. 18-23.)  He filed his pro se Petition on September 11, 2024.[1] (ECF Doc. 4.)  The matter was assigned to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  The case is briefed and ripe for disposition.  (ECF Doc. 9; ECF Doc. 11.)

For the reasons set forth below, the undersigned recommends that the Court **DISMISS** Grounds One and Two based on procedural default and **DISMISS** Ground Three as non-cognizable on federal habeas review.

---

[1] "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack*, 487 U.S. 266, 273 (1988)).  Mr. Dukes states he placed the Petition in the prison mailing system on September 11, 2024. (ECF Doc. 4, p. 15.)  The Petition was originally filed in the Southern District Ohio September 19, 2024, and transferred to this Court on September 23, 2024.  (ECF Doc. 1; ECF Doc. 4.)

1

# I.    Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  *See id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Ninth District Court of Appeals summarized the facts underlying Mr. Dukes's conviction and sentence as follows:

> {¶1} Mr. Dukes was indicted by a Summit County grand jury for two counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree; and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4) and (C)(2), felonies of the third degree. On November 2, 2021, the indictment was supplemented with two counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree. Each count of the supplemental indictment included a repeat violent offender ("RVO") specification pursuant to R.C. 2941.149(A). It was alleged in the indictment that Mr. Dukes had engaged in sexual conduct with his 10-year-old step-granddaughter, E.C.

> {¶3} The matter proceeded to a jury trial on May 31, 2022. At the start of the trial, the State moved to dismiss counts one and two and proceeded on counts three through six of the indictment. The court renumbered the remaining counts as one through four. Mr. Dukes waived his right to a trial by jury on the repeat violent offender specifications, allowing for those to be tried by the court.

> {¶4} The evidence adduced at trial is as follows. The victim, E.C., along with two of her younger siblings, were visiting their grandmother's home for a week-long sleepover to celebrate the end of the school year. E.C. testified her grandmother would take her and her siblings to the pool, shopping, roast marshmallows, and play in a tent in their grandmother's backyard. One night, after she fell asleep, E.C. said she awoke to someone touching her inappropriately while she slept in the bed next to her siblings. She said the touching continued for several consecutive nights. E.C. identified the person who touched her as her step-grandfather, Mr. Dukes. She testified that on the third night that this happened, she heard her grandmother, S.M.D., confront Mr. Dukes in the hallway as he was leaving the children's room. Mr. Dukes told her grandmother that he had been in the children's room covering up the kids. When S.M.D. entered the room though, she saw E.C. was uncovered. E.C. said her grandmother covered her up and proceeded to use the bathroom and return to her bed.

2

{¶5} E.C. testified that a few days later her sister said "something weird" that made her grandmother "[tell] me she remembered what [Mr. Dukes] did that night." E.C. said her grandmother then left the living room, came back in, and asked E.C. if she remembered what Mr. Dukes did the night he was in her room. E.C. testified she told her grandmother that she did remember, so her grandmother took her out of the living room into the dining room to talk to her about it. E.C. said her grandmother "got really surprised so [she] called my mom, and then my mom got really surprised because I told her what happened [with Mr. Dukes] and then [E.C.'s mother] called again and asked if I was ready to tell the police about it. I told her yes."

{¶6} The State presented the testimony of E.C.'s grandmother S.M.D., Mr. Dukes' wife. S.M.D. met Mr. Dukes in 2001 through an acquaintance, and they married in 2016. She testified that every year at the end of the school year, she would have her grandchildren come and stay with her for a week. With her grandchildren, S.M.D. said they "bought a swimming pool, set up a tent, and we made ice cream, smores, and watched movies." She said that every evening she would try to get the children in bed by 10:00 pm, because Mr. Dukes usually worked an afternoon shift and arrived home from work at about 11:15 pm.

{¶7} S.M.D. testified that in the early morning hours of June 12, 2020, while her grandchildren were sleeping over at her house, she woke up between 1:00 and 2:00 am. She stated "the Holy Spirit woke me up" and she went out into the hallway and "saw [Mr. Dukes] coming out of the [children's] room and closing the door." This was not something Mr. Dukes normally would be doing because she "always told him to let [her] take care of the kids." She testified she asked Mr. Dukes what he was doing in the children's room and he said he was "covering up the kids." So she went into the children's bedroom, turned the light on, and found "[t]here was no cover on the kids." S.M.D. testified that Mr. Dukes "didn't want me to go in there" but that she went into the children's room anyways. She said that they "had a few words and went back to sleep."

{¶8} S.M.D. further testified that the following Sunday:

> E.C. was sitting on the couch, and I was sitting on the couch across from her. And so she was just, like, sitting and staring into space, like. And I -- I don't know, women's intuition or whatever you want to call it, I asked her, I said, "E.C., do you remember [Mr. Dukes] coming into the room?" And she said, "Yes." I said, "Is there anything you want to talk to me about? And she said, "Yes."
>
> * * *
>
> [E.C.] said, "I felt something heavy on my chest," and she said, "Mr. Dukes put his hands in my pants and touched parts of my privates."
>
> * * *

3

[S]he said he came in there three times during -- from Tuesday, Wednesday, Thursday.

S.M.D. also testified that E.C. told her that she had heard the conversation between her grandmother and Mr. Dukes in the early morning hours on Friday, June 12, 2020, but that she "was just scared" and did not say anything.

{¶9} S.M.D. also described her husband's behavior as out of the ordinary following the visit to his home by the police: "He started reading his Bible every day. Every day. Every morning. Every night. And we also went to go see a preacher, and he prayed with him."

{¶10} S.M., E.C.'s mother, testified she had been at her mother's house the day before the police were called and "noticed that [E.C.] just was, like, real reserved and stayed in a tent." She noticed her daughter "kept getting up every five minutes going to the bathroom[.]" She asked her daughter what was wrong and E.C. replied "she didn't want to talk about it." The next day, S.M. received a call from her mother, S.M.D., who put E.C. on the phone. During the call, "[E.C.] was crying" and told her "[t]hat [Mr. Dukes] put his hands in her bra and in her panties." S.M. testified she called the police and immediately went to her mother's house. S.M. spoke with the police officers when they arrived. When the police officers left, she took all of her children home and waited for her adult son to come home from work so he could stay with her younger children while she took E.C. to Akron Children's Hospital for an examination.

{¶11} S.M. testified about the effect the sexual assault had on her daughter: "she just -- she wasn't herself anymore. She was always upset. Couldn't sleep at night. Crying. Angry." As a result of these behavior changes, S.M. sought treatment for her daughter at Child Guidance and Family Solutions.

{¶12} The State presented testimony from Officer Davon Jackson, one of the officers who responded to the call from S.M. at the Dukes' home. Officer Jackson testified that when he arrived at the Dukes' home, S.M.D. was present and told him that E.C.'s mother had left the scene and was at a nearby gas station. He also spoke with Mr. Dukes, who was at the home. Officer Jackson also spoke with E.C., who seemed "scared, timid. Her voice was extremely shaky." Officer Jackson testified that when he spoke with E.C., she was alone and no other family members were present. E.C. told him "that she was on the edge of the bed, that [Mr. Dukes] came in, reached over top of her, uncovered her, and touched her private parts." Officer Jackson stated that he also spoke to E.C.'s mother and grandmother, before notifying his supervisor and the detective bureau about the allegations being made. Officer Jackson testified that he left the scene shortly after 9:00 pm.

{¶13} The State also presented the testimony of several medical professionals that treated E.C. at Akron Children's Hospital and in the weeks following the sexual assaults. Shannon Smith, the overnight social worker at Akron Children's Hospital who conducted the initial interview with E.C., testified E.C. told her that when she

4

was spending the night at her grandparents' house with her two siblings, while she was sleeping, "she would wake up to her pants and her underwear being down, and [Mr. Dukes] would put fingers in her private parts. She explained her private parts as what she uses to poop and pee." Ms. Smith also testified that no rape kit was ordered because E.C. was brought into the hospital over 72 hours after the last alleged sexual assault. Ms. Smith testified when she interviewed E.C., E.C. was alone and in a separate room from others.

{¶14} Dr. Brett Luxmore is an emergency medicine physician who was working at Akron Children's hospital on the night E.C. was brought to the hospital. Dr. Luxmore explained that if the child does not require immediate emergency treatment, an interview is conducted by a social worker as a first step to help direct treatment. Dr. Luxmore testified that a rape kit was not performed, not only because it was 72 hours after the last alleged contact, but also because the child had reported she had showered and "there's also a lack of reported significant DNA contact" since the sexual contact was "finger penetration to a vagina and buttocks area." Dr. Luxmore noted all of these factors "decrease the likelihood of finding anything on a rape kit." Dr. Luxmore testified E.C. reported experiencing "dysuria, which means painful urination and * * * a sensation to go more frequently to the bathroom to urinate." He also testified that an insertion of an object into the vagina could cause the condition, but was unable to say for certain what was the cause. He did perform a urinalysis to check for "sign[s] of infection, * * * injury, * * * menstrual cycle, [or] * * * kidney stone" as a possible cause. The urinalysis came back "clean," ruling out those possible other causes of the dysuria.

{¶15} Darla Helmick is a social worker at Akron Children's Hospital. She conducts forensic interviews in the CARE Center of the hospital, typically with children who have been victims of sexual abuse. Ms. Helmick conducted the forensic interview of E.C. She conducted the interview without E.C.'s mother present, and made sure that E.C. knew that her mother was not watching. Ms. Helmick testified E.C. stated she had been touched inappropriately four different times by Mr. Dukes. E.C. indicated to Ms. Helmick that Mr. Dukes had pulled her pants down, touched her vaginal area, and then pulled her pants back up. E.C. did not disclose any anal or breast touching. Ms. Helmick testified that "it's not unusual for kids to not tell me everything." When asked whether she would expect a child to not leave out certain "big things," Ms. Helmick stated:

> I don't look at it that way. Kids -- kids will sometimes tell me that someone sexually assaulted them, and then maybe they'll tell me they were raped vaginally and there was also anal rape and they never reported that to me. That might be a big thing to you, but the child doesn't want to tell me that for some reason, and that's not unusual.

Ms. Helmick also testified that she had been employed as a social worker for 33 years, had received significant forensic interview training, and had been employed at Akron Children's Hospital since 2016.

{¶16} Kathleen Nduati, an advanced practice registered nurse at Akron Children's Hospital, also met with E.C. at the CARE Center. She testified on behalf of the State that over the past seven years, she had evaluated close to a thousand children for sexual abuse at Akron Children's Hospital. Ms. Nduati testified that she recommended E.C. receive counseling at Child Guidance and Family Solutions.

{¶17} Amber Thacker, a licensed professional counselor at Child Guidance and Family Solutions also testified for the State. She performed a diagnostic health assessment of E.C. when she sought treatment at Child Guidance and Family Solutions. Ms. Thacker testified about the things E.C. reported experiencing that resulted in her seeking treatment:

> I learned that [E.C.] had been struggling with flashbacks of her sexual assault. She had been unable to sleep at night. I had learned that she had been up until 5 or 6:00 in the morning. She described it as being up until the sun was up again. She presented with sad mood, low self-esteem, anxiety, fear of her peers judging her, and mom was worried about that.

Ms. Thacker diagnosed E.C. with post-traumatic stress disorder ("PTSD"). She testified that E.C. had given her some details of the sexual assault. E.C. identified Mr. Dukes as the individual who came into her room at night at her grandmother's house. E.C. told Ms. Thacker that when the lights were off in the bedroom at her grandmother's house, Mr. Dukes put his fingers in her vagina.

{¶18} Mr. Dukes testified in his own defense, and was the only witness testimony presented by the defense. He started his testimony by describing how he had previously been convicted of aggravated burglary and domestic violence. He testified on the day that E.C. disclosed the allegations to his wife, he had gone to the store and bought his wife beer that she had been drinking all day. With regard to the moment his wife confronted him with the allegations made by E.C., he testified:

> I was upstairs watching TV at the time. But I had went to the store earlier and got her some beer that day, so this was all in the evening so she was still drinking through most of the day. So I come downstairs, and that's when she questioned me. But I was just shocked. All I said was just, "[y]ou've got to be kidding," and that was -- you know, I don't get loud because I don't drink nomore. * * * She say "Why ain't you hollering?" I said, "Sue, I don't need to be hollering because I didn't do it."

{¶19} With regard to the evening his wife saw him exiting the children's bedroom, Mr. Dukes testified that he had been in the bathroom when he heard E.C.'s youngest sister crying. He stated that he went in the children's room, reached over E.C., and calmed the child, and was only in the children's room for about ten seconds. Mr. Dukes disputed his wife's testimony that he began acting differently after the incident on June 14, "[s]he made that up at the time[,]" but admitted he started reading his Bible more "because I didn't understand what was going on and I was

6

asking God for help[.]" Mr. Dukes testified that when he called his wife from work the next day after the police were called, he could hear the grandchildren in the background and they had returned to their grandmother's home. Mr. Dukes testified that he did avoid talking to E.C.

{¶20} The jury returned a verdict on June 3, 2022, finding Mr. Dukes guilty of all four counts of the indictment. Additionally, the jury made a special finding that the victim was less than thirteen years of age at the time of the offense.

{¶21} On June 7, 2022, the trial court entered findings on the RVO specifications, finding Mr. Dukes guilty of RVO specifications attached to each rape count of which he was convicted. The trial court sentenced Mr. Dukes to a prison sentence of life in prison with eligibility for parole after 25 years.

*State v. Dukes*, 2023 WL 5274048, at *1-5 (Ohio App. Ct. Aug. 16, 2023); (ECF Doc. 9-1, pp. 99-107.)

## II. Procedural Background

### A. State Court Conviction

On October 4, 2021, the Summit County Grand Jury indicted Mr. Dukes on two counts of rape (Counts 1 & 2) and two counts of gross sexual imposition (Counts 3 & 4). (ECF Doc. 9-1, pp. 3-4.) On October 18, 2021, Mr. Dukes pled not guilty to all charges. (*Id.* at pp. 5-6.) On November 2, 2021, a supplemental indictment was issued by the Summit County Grand Jury, charging Mr. Dukes with two additional counts of rape with repeat violent offender specifications (Counts 5 & 6). (*Id.* at pp. 7-8.) On November 8, 2021, Mr. Dukes pled not guilty to the additional charges. (*Id.* at pp. 9-10.)

Prior to trial, the State moved to dismiss Counts 1 & 2. (*Id.* at p. 12.) The trial court granted the motion and renumbered Count 5 as Count 1, rape with repeat violent offender specification, and Count 6 as Count 2, rape with repeat violent offender specification. (*Id.*) On May 31, 2022, Mr. Dukes waived his right to a jury trial as to the repeat violent offender specifications (*id.* at p. 11) and the jury trial commenced as to the other charges (*id.* at p. 13). The trial proceeded and the jury began its deliberations on June 2, 2022. (*Id.*) On June 3, 2022,

7

the jury returned guilty verdicts on Counts 1 through 4. (*Id.*) The trial court found Mr. Dukes guilty as to the specifications to Counts 1 and 2. (*Id.* at p. 19.) At the sentencing hearing on June 7, 2022,[2] the trial court imposed: a definite term of life with eligibility for parole after serving 10 years on Count 1; a definite term of life with eligibility for parole after serving 10 years on Count 2; a definite term of 5 years on Count 3; definite term of 5 years on Count 4; and a definite 5-year mandatory term on the repeat violent offender specification to Count 1.[3] (*Id.* at pp. 18-23.) The trial court ordered the terms imposed in Counts 1 and 2 and the specification to run consecutively to each other and the terms imposed in Counts 3 and 4 to run concurrently to each other and concurrently to the terms imposed in Counts 1 and 2 and the specification for a total prison sentence of life in prison with eligibility for parole after 25 years. (*Id.* at p. 20.)

**B.     Direct Appeal**

On July 6, 2022, Mr. Dukes filed a notice of appeal through counsel with the Ninth District Court of Appeals. (ECF Doc. 9-1, p. 24.) In his November 28, 2022 appellate brief, Mr. Dukes raised the following assignments of error:

> 1.     The trial court erred in denying appellant's motion for mistrial based on prosecutorial misconduct.
>
> 2.     The trial court erred when it overruled a timely defense motion for acquittal pursuant to Criminal Rule 29 as there was not sufficient evidence presented by the State of Ohio to establish a prima facie case of rape or gross sexual imposition to warrant the case being submitted to the jury.
>
> 3.     The verdict of the trial court was against the manifest weight of the evidence.

---

[2] The journal entry was docketed on June 13, 2022. (ECF Doc. pp. 18-23.)

[3] The trial court elected to impose a prison sentence on only one of the two specifications. (ECF Doc. 9-1, p. 20.)

(*Id*. at pp. 25-45.)  The State filed a brief in response on January 30, 2023.  (*Id*. at pp. 46-98.)  On

August 16, 2023, the Ninth District Court of Appeals affirmed the trial court's judgment.  (*Id*. at

pp. 99-117.)  He did not file a timely appeal with the Supreme Court of Ohio.[4]

### C.      Delayed Appeal to the Supreme Court of Ohio

On October 20, 2023, Mr. Dukes filed a pro se motion for leave to file a delayed appeal

(ECF Doc. 9-1, pp. 118-41) and notice of delayed appeal (*id*. at pp. 142-43) with the Supreme

Court of Ohio.  He asserted that his appeal had not been timely filed because:

> [He] requested his judgment entry from the Summit County Clerk of Courts but did
> not receive it until after he felt it was necessary to mail his documents to this Court.
> Further, the package (without the appellate judgment) was mailed on September
> 19, 2023. The Clerk of this Court returned it on September 25, 2023, indicating a
> timely appeal would be due October 2, 2023. This would have left time for
> Appellant, who by this time had received his appellate judgment entry, to resend
> all the required materials (hopefully without interference from the prison system).
> That is, until Noble Correctional Institution held his legal mail until the morning of
> October 10, 2023, a full fifteen (15) days after it was sent by the Court. This can be
> seen as nothing less than an intentional disruption of Appellant's access to the
> Court.

(*Id*. at p. 120.)  Based on the alleged prison mail room delays and delays in receiving

documentation necessary for his appeal, he argued the Supreme Court of Ohio should grant him

permission to file a delayed appeal.  (*Id*. at pp. 120-21.)  On December 26, 2023, the Supreme

Court of Ohio denied Mr. Dukes's motion for delayed appeal.  (*Id*. at p. 144.)

### D.      Federal Habeas Corpus Petition

Mr. Dukes raises three grounds for relief in his Petition.  (ECF Doc. 4, pp. 5-10.)

**Ground One:** Trial court erred in denying motion for mistrial.

---

[4] Mr. Dukes had 45 days from the date of the appellate court's judgment, or until September 30, 2023, to file an appeal with the Supreme Court of Ohio.  *See* Ohio S. Ct. Prac. R. 7.01(A)(1)(a)(i).  September 20, 2023, fell on a Saturday.  Thus, Mr. Dukes's appeal was due on October 2, 2023.  *See* Ohio S. Ct. Prac. R. 3.03(A)(1)("If the last day of the period is a Saturday, Sunday, or legal holiday, the period runs until 11:59:59 p.m. local observed time in Columbus, Ohio on the next day that is not a Saturday, Sunday, or legal holiday.")

**Supporting Facts:** Prosecutor actions were improper and constituted prosecutorial misconduct.

**Ground Two:** Trial court erred when it overruled motion for acquittal pursuant to Criminal Rule 29.

**Supporting Facts**:  The State of Ohio failed to present sufficient evidence to prove identity.

**Ground Three:** The verdict was against the manifest weight of the evidence.

**Supporting Facts:** A review of the record supports the fact the jury lost it's way.

(*Id.*)

### III.    Law & Analysis

**A.    Standard of Review Under AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214 ("AEDPA") limits the adjudication of federal habeas petitions in which state prisoners have collaterally attacked their convictions.  *See Reed v. May*, 134 F.4th 455, 459 (6th Cir.), *cert. denied sub nom. Reed v. Fredrick*, 146 S. Ct. 226, 223 L. Ed. 2d 78 (2025); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.").  Under 28 U.S.C. § 2254, as amended by AEDPA, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies."  *Cullen*, 563 U.S. at 181 (citing 28 U.S.C. §§ 2254(a), (b), (c)).

"AEDPA's 're-litigation bar' applies when a state court denies a prisoner's claim on the merits, rather than denying it for procedural reasons."  *Reed*, 134 F.4th at 459 (citing 28 U.S.C. §

10

2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011)).  Under the "re-litigation bar," when a federal habeas application involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the State court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington*, 562 U.S. at 100.  The burden of proof rests with the petitioner.  *See Cullen*, 563 U.S. at 181.

The Sixth Circuit has explained that "AEDPA authorizes a federal court to grant a writ of habeas corpus for state prisoners only to guard against 'extreme malfunctions in the state criminal justice systems.'" *Hodge v. Plappert*, 136 F.4th 648, 657 (6th Cir. 2025), *cert. denied*, 223 L.Ed. 2d 535 (U.S. Jan. 12, 2026) (quoting *Shinn v. Ramirez*, 596 U.S. 366, 377 (2022)).  This is because "Congress recognized that '[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" *Hodge*, 136 F.4th at 657–58 (quoting *Harrington*, 562 U.S. at 103 (brackets in original).  "Congress designed 28 U.S.C. § 2254(d) to remind federal courts that 'state courts are the principal forum for asserting constitutional challenges to state convictions.'" *Hodge*, 136 F.4th at 658 (quoting *Harrington*, 562 U.S. at 103).

## B.     Legal Standard for Procedural Default

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  *See* 28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  *See* 28 U.S.C. §§ 2254(b), (c); *Anderson v. Harless*, 459

11

U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").

To satisfy the fair presentation requirement, a habeas petitioner must present both the facts and legal theories underpinning his claims to the state courts. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987). A constitutional claim for relief must also be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

A petitioner must also meet certain procedural requirements to have his claims reviewed in federal court. *See Smith v. State of Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as . . . rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies where state remedies are "still available at the time of the federal petition." *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). In contrast, procedural default applies where state court remedies are no longer available. *See id.*

Procedural default may occur in two ways. First, a petitioner may procedurally default a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate

12

state court." *Id.* In *Maupin v. Smith,* the Sixth Circuit articulated a four-prong analysis to be used when determining whether a claim is procedurally barred due to failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim, and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *See Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *State v. Moreland*, 50 Ohio St.3d 58, 62 (1990) (finding failure to present a claim to a state court of appeals constituted a waiver). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. Thus, even if the exhaustion requirement is technically satisfied because no state remedies remain available to the petitioner, the petitioner's prior failure to present those claims for consideration in state court

13

may cause a procedural default that bars federal court review of the claims.  *See id.* (citing

*Coleman v. Thompson,* 501 U.S. 722, 732 (1991)).

To overcome procedural default, a petitioner must: (1) show cause for the default and

demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show

that there will be a fundamental miscarriage of justice if the claims are not considered. *See*

*Coleman*, 501 U.S. at 750.  "A fundamental miscarriage of justice results from the conviction of

one who is 'actually innocent.'"  *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006)

(quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

**C.      Ground Three is Non-Cognizable on Federal Habeas Review**

In this third ground for relief, Petitioner contends the jury verdict was against the

manifest weight of the evidence.  (ECF Doc. 4, p. 8.)  Respondent argues Ground Three is not

cognizable on federal habeas review.  (ECF Doc. 9, pp. 22-23.)  The undersigned agrees.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations

on state-law questions. In conducting habeas review, a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991).  Manifest weight of the evidence claims arise under state

law and are therefore not cognizable on federal habeas review. *See Hoerig v. Olds*, No. 24-3382,

2025 WL 2462747, at *3 (6th Cir. Jan. 21, 2025) (explaining that a claim that a "conviction is

against the manifest weight of the evidence . . . presents an issue of state law that is not

cognizable on federal habeas review") (citing *Estelle*, 502 U.S. at 67-68; *Nash v. Eberlin*, 258 F.

App'x 761, 764 n.4 (6th Cir. 2007)), *cert. denied,* 146 S. Ct. 267 (2025), *reh'g denied,* No. 25-

5466, 2026 WL 795135 (U.S. Mar. 23, 2026); *Hively v. Wainwright*, No. 18-3331, 2018 WL

4927089, at *1 (6th Cir. July 31, 2018) (holding that a "manifest weight of evidence" claim

14

"does not present a federal constitutional question and is not cognizable on federal habeas review") (citing *Johnson v. Havener*, 534 F.2d 1232, 1234 (6th Cir. 1976)).

Accordingly, the undersigned recommends that the Court **DISMISS** Ground Three as non-cognizable on federal habeas review.[5]

## D.      Grounds One and Two Were Procedurally Defaulted

Respondent argues that the Petition should be dismissed because all three grounds for relief were procedurally defaulted.[6] (ECF Doc. 9, pp. 12-13.) Specifically, Respondent argues that the claims were procedurally defaulted when Mr. Dukes "failed to perfect a timely appeal" of the state court of appeals ruling on his direct appeal "to the Ohio Supreme Court within the 45-day period to seek discretionary review" under Ohio S. Ct. Prac. R. 7.01(A)(1)(a)(i). (*Id.*) Although Mr. Dukes later filed a motion for leave to file a delayed appeal with the Supreme Court of Ohio, Respondent argues that the court's eventual denial of that motion resulted in a procedural default under the *Maupin* standard (*id.* at p. 13), and that Petitioner has not demonstrated cause, prejudice, or a miscarriage of justice to excuse the default (*id.* at pp. 13-14).

In response, Petitioner argues: (1) the State did not meet the Court's deadlines to raise the procedural default defense (ECF Doc. 11, p. 3); (2) he did not procedurally default his claims because he fairly presented them to the state appellate court and the Supreme Court of Ohio declined to accept his appeal and rule on the merits (*id.* at pp. 4-5); (3) he received ineffective assistance of trial and appellate counsel (*id*. at pp. 5-8); and (4) he is innocent (*id.* at pp. 5, 8). The undersigned will address each argument in turn.

---

[5] If it were cognizable on federal habeas review, Ground Three would be subject to dismissal based on procedural default for the same reasons explained in Section III.D., *infra*, with respect to Grounds One and Two.

[6] In Ground One, Mr. Dukes argues the trial court erred in denying his motion for mistrial based on prosecutorial misconduct. (ECF Doc. 4, p. 5.) In Ground Two, he argues the trial court erred in denying his motion for acquittal based on insufficient evidence to prove identity. (*Id*. at p. 7.)

First, the assertion that Respondent failed to "meet the timeline set by this court" (ECF Doc. 11, p. 3) lacks merit.  Respondent timely filed the Return of Writ on December 16, 2024, after the Court granted an extension of time until that date for filing.  (*See* December 3, 2024, Non-Document Order; ECF Doc. 9.)

Second, Petitioner is correct that he fairly presented the claims in Ground One and Two on direct appeal (ECF Doc. 9-1, pp. 31-34; *see also* ECF Doc. 9, p. 12) and filed a pro se motion for leave to file delayed appeal of the court of appeals decision in the Ohio Supreme Court (ECF Doc. 9-1, pp. 118-41).  (*See* ECF Doc. 11, pp. 4-5.)  He is also correct that the Supreme Court of Ohio denied his motion for delayed appeal without reaching the merits (ECF Doc. 9-1, p. 144).  (*See* ECF Doc. 11, p. 4.)  However, Petitioner's brief fails to address Respondent's central argument: that the denial of his motion for delayed appeal resulted in a procedural default.

### 1.      Grounds One and Two Were Procedurally Defaulted

The first way a petitioner may procedurally default is by failing "to comply with state procedural rules in presenting his claim to the appropriate state court."  *See Williams*, 460 F.3d at 806.  This is the basis upon which Respondent argues Mr. Dukes procedurally defaulted.  (ECF Doc. 9, p. 13.)  To assess procedural default on this basis, courts in this circuit apply the four-prong *Maupin* analysis.  *See Williams*, 460 F.3d at 807 (citing *Maupin*, 785 F.2d at 138).

Under the first two prongs of the *Maupin* analysis, this Court must determine whether Mr. Dukes failed to comply with a procedural rule and whether the state enforced that rule. *See* 785 F.2d at 138. The procedural rules for an appeal to the Supreme Court of Ohio required Mr. Dukes to file his appeal "within forty-five days from the entry of the judgment being appealed," S. Ct. Prac. R. 7.01(A)(1)(a)(i), which he failed to do.  The procedural rules also permitted Mr. Dukes to file a motion for a delayed appeal, but such motions are granted only at the discretion

of the Supreme Court of Ohio.  *See* S. Ct. Prac. R. 7.01(A)(4).  Mr. Dukes filed a motion for delayed appeal on October 20, 2023 (ECF Doc. 9-1, p. 118), but the court exercised its discretion to deny the motion (*id.* at p. 144).  Thus, Mr. Dukes failed to comply with a procedural rule and the state enforced that rule.  The first two prongs of the *Maupin* analysis were met.

Under the third *Maupin* prong, this Court must determine whether the relevant procedural rule establishes an adequate and independent state law ground under which the claim may be procedurally defaulted.  *See* 785 F.2d at 138.  The Sixth Circuit has confirmed that "Ohio court rules indicate that the denial of a motion for a delayed appeal is a procedural ruling, not a ruling on the merits." *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004).  Courts thus "recognize[] that such a denial is 'an adequate procedural ground to foreclose federal habeas review.'" *Davenport v. Fender*, No. 1:20-CV-0561, 2023 WL 1785492, at *13 (N.D. Ohio Jan. 5, 2023), *report and recommendation adopted*, No. 1:20 CV 0561, 2023 WL 1782121 (N.D. Ohio Feb. 6, 2023) (citations omitted).  The third prong of the *Maupin* analysis has also been met.

Before addressing the fourth *Maupin* prong, the undersigned also observes that the record supports an additional basis for procedural default.  On federal habeas review, a district court cannot consider issues that were not presented at every level of the Ohio state court system.  *See Baston*, 282 F. Supp. 2d at 661.  Thus, where a petitioner has not pursued a claim "through the state's 'ordinary appellate review procedures,'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848), and "state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted," *id.* at 806.  By failing to file a timely appeal with the Supreme Court of Ohio, Mr. Dukes failed to pursue his claims through the state's ordinary appellate review procedures, and the Petition was procedurally defaulted on that basis as well.

17

The fourth *Maupin* prong addresses whether Mr. Dukes can show cause for his failure to timely file his Ohio Supreme Court appeal and further show that he was actually prejudiced by the constitutional errors alleged in Grounds One and Two. 785 F.2d at 138. Similarly, to excuse his procedural default for failing to present the claims in Grounds One and Two at every level of the Ohio state court system, Mr. Dukes must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750. The undersigned therefore turns to whether there is a basis to excuse procedural default.

**2.      Petitioner Has Not Shown Cause and Prejudice to Excuse Procedural Default**

Although Mr. Dukes titles one section of his Traverse "Cause and Prejudice," his argument in that section does not address the "cause" or "prejudice" necessary to excuse a procedural default, focusing instead on the fair presentation arguments discussed above. (*See* ECF Doc. 11, p. 4.) But Mr. Dukes also argues under the title "In Further Support of Grounds" that he received ineffective assistance from his trial and appellate counsel. (*See id.* at pp. 5-8.) Given Petitioner's pro se status, the undersigned will consider whether his ineffective assistance arguments could support a finding of "cause" to excuse the procedural default.

To establish "cause" to excuse procedural default, a petitioner must point to "something external . . . that cannot fairly be attributed to him" and "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Here, Mr. Dukes does not describe any activity involving his trial attorney or appellate attorney on direct appeal that prevented or impeded him from filing a timely appeal with the Supreme Court of Ohio, let alone

18

activity that rose to the level of ineffective assistance.[7]  This is understandable, since Mr. Dukes represented himself at the time his appeal was due to the Supreme Court of Ohio and had "no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (citing *Wainwright v. Torna*, 455 U.S. 586 (1982) and *Ross v. Moffitt*, 417 U.S. 600 (1974)).  It is also well established that "pro se status before the Ohio Supreme Court is insufficient to establish cause to excuse . . . procedural default." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004); *see also Canales v. Gray*, No. 5:18CV1857, 2021 WL 3056317, at *2 (N.D. Ohio July 20, 2021) ("[A] petitioner's pro se status and limited access to the prison law library are insufficient to establish cause to excuse procedural default.") (citing *Bonilla*, 370 F.3d at 498).  Accordingly, neither the actions of Petitioner's attorneys nor his pro se status support a finding of "cause" to excuse his default.

Also in light of Petitioner's pro se status, the undersigned considers his arguments to the Supreme Court of Ohio that he did not timely file his appeal because of mailing delays involving the Summit Count Clerk of Courts and Noble Correctional Institution.  (*See* ECF Doc. 9-1, pp. 119-21.)  Although it would be sufficient to note that Mr. Dukes did not raise his arguments regarding delayed mailings in the Petition or Traverse,[8] the undersigned also concludes that his arguments regarding mail delays would not be sufficient to establish "cause" to excuse the default even if Mr. Dukes re-asserted the arguments word-for-word in these proceedings.  This is because Petitioner's arguments regarding the impact of alleged mailing delays on his ability to

---

[7] Instead, he references unspecified legal claims that his appellate counsel allegedly failed to raise on direct appeal (ECF Doc. 11, pp. 5-7) and unspecified ineffective assistance by his trial counsel in response to what Petitioner characterizes as false allegations against him (*id.* at pp. 7-8).  In addition to being entirely vague, these arguments bear no relation to the procedural default at issue, i.e., the failure to timely appeal to the Supreme Court of Ohio.

[8] *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original); *see also Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (finding argument first presented in traverse was not properly before the district court).

19

file a timely appeal to the Supreme Court of Ohio rely on his own self-serving assertions, without credible evidentiary support.  (*See id.*); *see, e.g., Davenport*, 2023 WL 1785492, at *14-15 (finding a petitioner's self-serving affidavit, without corroborating evidence, insufficient to establish "cause" to excuse an untimely appeal to the Supreme Court of Ohio); *Fox v. Turner*, No. 3:15 CV 2542, 2017 WL 1379887, *6-7 (N.D. Ohio March 17, 2017) (finding a petitioner failed to establish "cause" for failing to timely appeal to the Supreme Court of Ohio when he asserted without evidentiary support that he had submitted a timely filing), *report and recommendation adopted*, No. 3:15CV2542, 2017 WL 1365783 (N.D. Ohio Apr. 14, 2017); *Donnal v. Sheets*, No. 3:08 CV 932, 2009 WL 3126404, at *3 (N.D. Ohio Sept. 24, 2009) (finding no "cause" to excuse procedural default when there was "no evidence in the record suggesting prison officials did not act promptly in mailing Petitioner's materials"); *cf. Maples v. Stegall*, 340 F.3d 433, 435-36, 439 (6th Cir. 2003) (finding a petitioner demonstrated cause to excuse a procedural default where the evidence showed he "attempt[ed] to deliver his petition for mailing in sufficient time for it to arrive timely in the normal course of events").

For the reasons set forth above, the undersigned concludes that Mr. Dukes has failed to establish cause to excuse the procedural default of Grounds One and Two.  Since he failed to demonstrate "cause" to excuse the default, it is not necessary to consider the issue of "prejudice." *See Smith v. Murray,* 477 U.S. 527, 533 (1986); *Engle*, 456 U.S. at 134, n. 43.

### 3.      Petitioner Has Failed to Show a Fundamental Miscarriage of Justice

This Court may also excuse the procedural default if Mr. Dukes shows that a failure to consider his claims would result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.  Mr. Dukes contests Respondent's argument that he has not met this standard by arguing broadly that he "has not failed to present evidence as to his innocence as the State has alleged," and that "[n]ew evidence was presented in the Post-Conviction and ignored by the State courts."

20

(ECF Doc. 11, p. 5.)  He further asserts that he "stalwartly maintains and further declares his *innocence*" and that his "[i]nnocence is argued, mentioned or at the very least implied in every single document filed in association with this case."  (*Id.* (emphasis in original).)

 "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren*, 440 F.3d at 764 (quoting *Murray*, 477 U.S. at 496).  For a claim of actual innocence to be credible in this context, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  He must further "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Id.* at 327. This standard is intended to permit petitioners with "truly extraordinary" cases a "meaningful avenue by which to avoid a manifest injustice."  *Id.* (internal quotations omitted).  Importantly, "'actual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623 (1998).

While Mr. Dukes claims he is innocent of the charges, he does not identify new reliable evidence that was not presented at trial to support this assertion.  He states in his Traverse that "[n]ew evidence was presented in the Post-Conviction and ignored by the State courts" (ECF Doc. 11, p. 5), but there is no record of such a post-conviction filing and he does not identify the "new evidence" he is referencing.  Based on the record before this Court, the undersigned concludes that Mr. Dukes has not met his burden to show that a failure to consider the merits of his procedurally defaulted claims would result in a fundamental miscarriage of justice.

For the reasons set forth above, the undersigned finds that Grounds One and Two are procedurally defaulted, and that Mr. Dukes has not met his burden to show cause or a

fundamental miscarriage of justice to excuse the default.  Accordingly, the undersigned recommends that the Court **DISMISS** Grounds One and Two based on procedural default.[9]

### IV. Recommendation

For the reasons set forth above, the undersigned recommends that the Court **DISMISS** Grounds One and Two based on procedural default and **DISMISS** Ground Three as non-cognizable on federal habeas review.


Date:    May 20, 2026


                                        */s/ Amanda M. Knapp*
                                        AMANDA M. KNAPP
                                        UNITED STATES MAGISTRATE JUDGE



**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

---

[9] Given the recommendation to dismiss Grounds One and Two as procedurally defaulted, it is unnecessary to consider Respondent's alternative argument that the claims are without merit.  (ECF Doc. 11, pp. 14-32.)